United States Courts
Southern District of Texas
FILED
APR 06 2026
Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TIMOTHY AGUILAR
*Plaintiff*

Case No.

v.

TRUSTAGE INSURANCE AGENCY LLC
JOHN DOE
*Defendants*

JURY TRIAL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES INTO COURT,** pro se plaintiff Timothy Aguilar ("Plaintiff") and files his Complaint to stop TruStage Insurance Agency LLC ("TruStage") un-licensed and/or un-registered telemarketers from engaging directly and or indirectly, in a harassing campaign of illegal final expense telemarketing that bombards Plaintiff with a tsunami of unwanted robocalls to his phone number that is registered on the national do-not-call registry ("DNCR"), including final expense calls that play artificial and/or pre-recorded voice messages with their avatars Charlotte & James.

## INTRODUCTION

1. This case arises from unsolicited telemarketing promoting TruStage's final expense policies in violation of the TCPA, 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about proliferation of intrusive calling practices. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012). TruStage as an entity – utilizes and/or contracts with telemarketers and/or lead generators to solicit their final expense insurance policies to consumers across the country, as they did with Plaintiff.

2. This case involves a campaign by Trustage who hired DOE telemarketer and/or lead generator to market its insurance services and/or products through unsolicited telemarketing calls, which

includes calling individuals on the DNCR without prior express consent and using spoofed numbers. By TruStage's telemarketer's placing these final expense calls to Plaintiff's DNCR phone number, TruStage and DOE's violated the privacy and statutory rights of this Plaintiff.

**JURISDICTION AND VENUE**

**3.** This Court has subject matter jurisdiction under 28 U.S.C § 1331, because the claims arise under the federal TCPA, 47 U.S.C. § 227. *Mims,* 565 U.S. 386-87 (2012)

**4.** This Court has personal specific jurisdiction over TruStage because TruStage's DOE telemarketers initiated and /or conducted illegal telemarketing on TruStage's behalf, to call Plaintiff's DNCR phone number, who resides in this District. TruStage's DOE telemarketer's illegal telemarketing towards Plaintiff is the subject of this dispute from which this lawsuit arises.

**5.** This Court has supplemental jurisdiction over the claims arising under Tex. Bus. & Com. Code § 302 and § 305. While the Texas Business and Commerce Code ("TBCC"), Chapter 302 and 305, is a state law, it complements and supplements the federal TCPA by providing additional protections to Texas residents against unwanted telemarketing calls. 28 U.S.C. § 1367.

**6.** Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to this action occurred within this district

**PARTIES**

**7.** Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

**8.** Defendant TruStage Insurance Agency LLC is an Iowa limited liability company.

**9.** TruStage's registered agent is CT Corporation System 400 East Court Ave, Des Moines, IA 50309.

**9.1** JOHN DOE(s) are unknown unregistered and/or unlicensed business entities and/or individuals not yet known by their true and lawful entity and/or individual name(s).

## Statutory Background of the TCPA

**10.** In 1991, Congress enacted the TCPA to combat "the proliferation of intrusive, nuisance calls to consumers and businesses from telemarketers." *Facebook, Inc. v. Duguid,* 592 U.S. 395, 399 (2021).

**11.** As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the TCPA generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 613 (2020).

**12.** The result of the telemarketing regulations was the national Do-Not-Call registry. See 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, he can add his number to the list. The TCPA then restricts the telephone solicitations that can be made to that number...This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people. The law empowers each person to protect his own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

**13.** As used herein, "TCPA" refers to both the federal statute 47 U.S.C. § 227 et seq. and its implementing regulations 47 C.F.R. § 64.1200 et seq.

**14.** The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. §§ 227(b) and (c) and or regulations promulgated thereunder. 47 U.S.C. § 227(c)(5).

**15.** The TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1] The TCPA prohibits initiating any telemarketing call unless the person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. 47 C.F.R. § 64.1200(d). This includes, inter alia, having a written policy, available upon demand, for maintaining a do not-call list, training personnel engaged in any aspect of telemarketing on the existence and use of the do-not-call list, identifying the name of the caller during each call, the name of the person or entity on whose behalf the call was made, and associated phone or address information, and actually honoring do-not-call requests within a reasonable time from the date such request is made. *Id.*

**16.** FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act* of 1991, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

**17.** The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC,* 28 FCC Rcd. 6574, 6574 ¶ 1 (2013). In fact, in May 2013, the FCC issued a binding declaratory ruling clarifying that sellers "may be held vicariously

[1] See Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers ...under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Id. In re Joint Petition Filed by DISH at* 6584 ¶ 28 (2013).

**18.** Additionally, in 2013, the FCC required prior express written consent for all autodialed or prerecorded calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act* of 1991, 27 F.C.C. Rcd. 1844. *Id.*

**19.** For damages, the TCPA provides "$500 in damages for each such violation[.]" 47 U.S.C. §§ 227(b)(3), (c)(5). However, the TCPA provides treble damages of $1,500 for each "willful" or "knowing" violation. *Id.*

**20.** Telemarketing is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to a person." 47 C.F.R. § 64.1200(f)(13).

**21.** The term "telephone solicitation" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 C.F.R. § 64.1200(f)(15).

**22.** The TCPA prohibits the use of artificial or prerecorded voices when calling cellular telephone numbers. 47 U.S.C. § 227(b)(1)(A)(iii).

**23.** The TCPA prohibits calling any "residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. §§ 64.1200(c)(2). Notably, "[s]uch do-not-call registrations must be honored indefinitely[.]" *Id.*

**24.** For such violations, the TCPA provides a private right of action for any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection[.]" 47 U.S.C. § 227(c)(5).

**25.** Accordingly, an entity can be liable under the TCPA for a prohibited call made on its behalf under a number of theories, including vicarious liability. Under those circumstances, including as described herein. TruStage, the seller is properly deemed to have initiated the call through the person or entity that actually placed it. Under the TCPA standard, the burden is on TruStage to demonstrate that Plaintiff gave his prior express consent to receive telemarketing calls featuring prerecorded message with artificial voices to his DNCR phone number, and, present proof that Plaintiff's DNCR phone number was negligently and with a callous disregard, overlooked by its telemarketers and/or not scrubbed on the DNCR and further invoke the Sgt. Shultz defense at trial.

## FACTUAL ALLEGATIONS

**26.** TruStage is a for-profit company that sells insurance, including funeral and burial insurance and utilizes illegal telemarketing tactics to promote its products and/or services to solicit new customers to generate new customers for its ever expanding portfolio.

**27**. Plaintiff personally registered his phone number ending in 832-XXX-7311 on the DNCR on or about September of 2012. *See* **Exhibit 1** Plaintiff has never de-listed this number from the DNCR.

**28.** Plaintiff personally registered his phone number ending in 832-XXX-7311 on the State of Texas Do-Not Call Registry on or about August 16, 2023. *See* **Exhibit 2**

**29.** TruStage and it's agent's have utterly failed to honor Plaintiff's DNC requests.

**30**. Plaintiff does not use his DNCR phone number for a business purpose. 47 C.F.R.§ 64.1400(d)(3).

**31**. Plaintiff made prior DNC requests in response to the pestilence of final expense calls from TruStage's telemarketers unsolicited telemarketing calls he received to his DNCR phone number starting on May 15, 2025 but such requests were ignored with a callous disregard.

**32**. TruStage and/or its Doe telemarketers have negligently failed to coordinate do not call requests ("DNC") amongst all individuals and or entities telemarketing on its behalf, and it does not ensure that they are properly scrubbing their call lists against their internal do not call lists nor the FCC's DNCR to avoid calling Plaintiff's phone number. As a result, Plaintiff continued to receive TruStage's telemarketing calls despite his prior do-not-call requests.

**33**. TruStage telemarketing efforts, though illegal while directed to this Plaintiff, include using third (3rd) parties who are compensated based on the number of new prospects they can bring to TruStage and potential new customers transferred to TruStage's call center and/or Doe telemarketers, and upon information and belief, this operation may all be grouped together.

**34**. TruStage appointed and/or hired John Doe with the knowledge and expectation that John Doe would make phone calls to solicit TruStage's products and services.

**35.** TruStage had the responsibility to ensure the agents TruStage appointed and authorized to solicit their products obeyed federal and state consumer protection laws.

**36.** Plaintiff has answered the estimated twenty (20) calls from a variety of spoofed phone numbers from TruStage's DOE telemarketers soliciting final expense life insurance products, whose illegal calls have been placed indirectly and or directly, on behalf of TruStage since about May 15, 2025.

**37.** TruStage is an entity that acts through its un-licensed and un-registered agent(s), DOE telemarketers and/or telemarketers to place calls into Texas and Plaintiff's DNCR phone number.

**38.** Plaintiff's telephone number as defined and set forth in 47 C.F.R. § 64.1200(a)(1)(iii), is a residential telephone number and is used for communicating with friends and family, navigation purposes, reading local news, sending and receiving emails, purchasing household needs from Amazon, paying bills (electric, gas, mortgage, car payment) attributable to plaintiff's residence, sending and receiving text messages to family and friends. Plaintiff pays for his cellphone from his personal checking account with Bank of America. By placing these calls at bar, to plaintiff's DNCR residential phone number, TruStage and their DOE telemarketers, calling on their behalf have violated the statutory right to Plaintiff's privacy and caused him to suffer damages that are recognized by statute, i.e. invasion and intrusion of privacy, his domestic peace, tranquility, seclusion; caused and/or initiated disruption and distraction into plaintiff's work week, caused anxiety, the constant ringing of plaintiff's cellphone by unwarranted final expense telemarketing calls from TruStage telemarketers and/or subagent(s), intruded upon and occupied the capacity of Plaintiff's cellular phone and a constant and daily depletion of the Plaintiff's cellphone battery; causing Plaintiff aggravation of these nuisance & constant intrusive calls, interfering with navigation routes when Plaintiff is running an errand, when Plaintiff is trying to sleep on his off days, while Plaintiff is having lunch and or dinner.

**39.** TruStage's Doe telemarketers, agents, sub-agents herein are practicing the art of "spoofing" in their scope of making telemarketing outbound calls to Plaintiff's DNCR phone number to manipulate the caller ID system, so it appears that their calls are from legitimate local phone numbers.[2] Such is a violation of Texas state law. Tx. Penal Code. §33A.051

**40**. TruStage's DOE telemarketers and or affiliate(s) utilize DIDs for "neighbor" spoofing and/or "snowshoe" spoofing.

**41**. TruStage's DOE telemarketer's and or lead generator(s) with spoofed local numbers, the James and Charlotte avatar voices listed herein and pre-recorded telemarketing script; the transfer of the January 15, 2026 illegal call; the electronic deposit by TruStage to Plaintiff's bank provided TruStage's specific identifier's that demonstrate TCPA liability and that the calls were connected to TruStage's illegal telemarketing efforts. Further, the call from TruStage's telemarketer with pre-recorded James avatar on February 9, 2026 and then the revelation from the TruStage Doe agent that Plaintiff had a policy with TruStage (*subpara.* R herein) is overwhelming and persuasive evidence that TruStage is the TCPA violator herein and liable for violating the TCPA's rules and regulations.

**42.** Plaintiff has never had any prior business relationship with TruStage, nor been a customer, nor granted express or written consent to TruStage or any entity or individuals acting on their behalf to receive a tsunami of final expense telemarketing calls.

---

[2] Caller ID "spoofing" occurs "when a caller deliberately falsifies the information transmitted to [a cell-phone owner's] caller ID display to disguise their identity." FCC, Caller ID Spoofing, https://www.fcc.gov/spoofing. The Federal Communications Commission has noted that "scammers often use neighbor spoofing so it appears that an incoming call is coming from a local number, or spoof a number from a company or a government agency that you may already know and trust." Id.; see, e.g., *Zelma v. Choice Energy, LLC*, Case No. 19-17535, 2020 WL 5201341, at *1 (D.N.J. Sept. 1, 2020).

**43**. Numbers used for snowshoeing are often phone numbers that cannot receive incoming calls as the calls demonstrated herein from TruStage's Doe telemarketers.

**44**. Plaintiff has made his do not call requests on multiple occasions and to be placed on internal do not call list. Those documented DNC requests fell upon deaf ears.

**45**. On information and belief, TruStage's multi-level marketing ("MLM") is designed to profit from a deliberate telemarketing business model that is calculated to evade liability under the TCPA. TruStage does not make the initial cold call itself, instead, it contracts and or sources out with a network of their alleged and approved un-licensed, unregistered third party vendors, lead generators and or telemarketers ("John Does") to make the illegal, unsolicited final expense calls to consumers like this Plaintiff in Harris County, Texas. **See Exhibit 3** Once caught and hauled into court, TruStage takes the Sgt. Schutlz defense and denies all TCPA liability and even though there is a final expense policy and other irrefutable evidence before the Court. But defense counsel prefers to waste scarce judicial resources where TCPA liability is apparent.

**46**. TruStage is well aware that its telemarketing campaign violates the spirit of the TCPA. TruStage has been the subject of multiple prior federal TCPA litigation for the exact reckless and willful conduct making the basis of this litigation today, the making of unsolicited robocalls to individuals on the DNCR using 3rd party agents. Despite this actual, constructive and repeated notices, TruStage has made a conscious business decision not to take any effective action to stop the pestilence of final expense calls as it continues to profit from the violations, until most recently, the telemarketing final expense calls to Plaintiff's DNCR phone number from the James and Charolette pre-recorded AI voice messages stopped completely. It took this present TCPA litigation to stop these invasive, annoying and harassing telemarketing calls from TruStage's agents.

**47**. The unlawful final expense calls Plaintiff received followed the established illegal pattern. The final expense calls utilized an automatic telephone dialing system ("ATDS") and/or artificial or pre-recorded robotic voice when Plaintiff answered. This is evidenced by the significant delay and pause of silence after Plaintiff answered, and the audible click and or boink. Plaintiff is then transferred and/or connected to a un-licensed and/or un-registered John Doe telemarketer, alleged product specialist and or verifier who initiate a serios of medical and personal qualifying questions. The Avatar did not respond naturally to introductory questions that Plaintiff asked, but instead proceeded with a fixed telemarketing script. Moreover, the incoming caller ID on almost every final expense call was illegally spoofed to display a local fictious number to make the Plaintiff believe that such illegal call was made within the Harris County, Texas area.

**48**. To the extent that the un-licensed Doe telemarketers and/or lead generators are not formal employees, they are nonetheless vested with authority to solicit, quote and sell TruStage life insurance policies by asking medical questions as contained in the TruStage's life insurance application. TruStage provided these un-licensed entities with the tools, product access, quoting platforms, and scripts necessary to complete sales on its behalf and then transfer the illegal call to an alleged non-licensed telemarketer to make the illusion more credible that a licensed agent wrote the final expense policy from the inception of the call. A feat that Houdini would be proud of.

**49**. By maintaining this structure, TruStage exercised day-to-day control over DOE's ability to sell its products, imposed compliance requirements, and conferred the appearance of employment to consumers like Plaintiff. Accordingly, DOE's illegal telemarketing and solicitation conduct is imputable to TruStage under doctrines of actual authority, apparent authority, or ratification.

**50**. TruStage is required by law to distribute its life-insurance products through a network of licensed insurance agents who are authorized to sell TruStage's policies not un-licensed or un-

registered foreign based telemarketers who act and/or impersonate licensed insurance professionals.

**51**. Upon information and belief, the following is a limited summary of the incoming calls placed, initiated, and made, indirectly and or directly, upon the behalf of TruStage's un-licensed and/or un-registered subagent(s), 3rd party vendor(s) and/or DOE Telemarketer (*known at this time without discovery and or subpoenas being issued)* to plaintiff's DNCR phone number:

a. On or about May 15, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-609-719-2879 at 9:32 am soliciting final expense insurance – DNC request made – same tele-script as the call listed herein in subpara. R -

b. On or about May 28, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-401-992-8923 at 5:06 pm soliciting final expense insurance – same tele-script as the call listed herein in subpara R. [3] (RC)

c. On or about July 1, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial call from avatar James from spoofed CID # 1-832-650-2548 at 6:51 pm soliciting final expense insurance - same tele-script as the call listed herein in subpara R. (RC)

d. On or about August 26, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial call from avatar James from spoofed CID # 1-832-645-7477 at 12:45 pm soliciting final expense insurance – same tele-script as the call listed herein in subpara R. (RC)

e. On or about August 29, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-424-3509 at 11:36 am pm soliciting final expense insurance –same tele-script as the call listed herein in subpara R.

f. On or about September 24, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-445-0994 at 3:17 pm soliciting final expense insurance –same tele-script as the call listed herein in subpara R.

g. On or about September 26, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-303-3591at 11:03 am

[3] (RC) means recorded call of the illegal telemarketing call.

soliciting final expense insurance – same tele-script as the call listed herein in subpara R. (RC)

h. On or about September 30, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-324-8076 at 10:10 am soliciting final expense insurance – same tele-script as the call listed herein in subpara. R.

i. On or about October 4, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar Charolette from spoofed CID # 832-510-906-3903 at 5:32 pm soliciting final expense insurance.

j. On or about November 11, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-624-2197 at 1:45 pm soliciting final expense insurance – same tele-script as the call listed herein in subpara R.

k. On or about November 25, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar Charolette from spoofed CID # 1-443-351-4212 at 4:34 pm soliciting final expense insurance. (RC)

l. On or about November 26, 2025, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-520-505-2452 at 2:06 pm soliciting final expense insurance - same tele-script as the call listed herein in subpara R where TruStage agent discloses identity after the transfer of the call. (RC)

m. On or about January 13, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-645-7056 at 3:07 pm soliciting final expense insurance – same tele-script as the call listed herein in subpara R.

n. On or about January 15, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial call from avatar Charolette to his DNCR phone number from spoofed CID # 1-832-689-9356 at 5:08 pm soliciting final expense insurance and the following tele-script was recorded:

"Hello.. Hi this is Charlotte .. how are you doing today? Based on the information we have it seems you may be eligible for a state sponsored final expense insurance plan that ensures all your funeral, burial and cremation expenses are covered are you between the age range of 50 to 80 -- can I ask if you are the one who handles financial decisions? All right please hold on a moment, I am going to transfer you to my senior specialist."

The transferred and/or merged call was answered by Jacob (foreign accent) and identified the insurance company as Senior Benefits for which he was calling upon behalf of. *A deceptive and false name*. Jacob indicated he had spoken with Plaintiff in the previous weeks but another false assertion. Jacob knew the Plaintiff's full name and exact age without Plaintiff disclosing such to Jacob. Plaintiff was then transferred to product specialist named Sam Davis, another foreign sounding telemarketer. Sam then advised that he was going to transfer the call to another agent to have a Medical Information Bureau report initiated. The agent that answered the transfer was another of your agents, a female named Reyna. The squelch sound was clearly heard during this transfer which indicates that the number being transferred was call restricted and or blacklisted. An automatic telephone dialing system was used in placing these calls to Plaintiff's DNCR phone number. (RC) The TruStage policy was bought to discover the TCPA violator.[4] **See Exhibit 4**

o. On or about January 22, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-689-5866 at 11:31 am soliciting final expense insurance – same tele-script as the call listed herein in subpara R - Telemarketer advises Plaintiff that he is putting plaintiff's number on the DNC. (RC)

p. On or about January 26, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar Charolette from spoofed CID # 1-832-689-3478 at 3:56 pm soliciting final expense insurance – transferred to live agent who terminated call. (RC)

q. On or about February 9, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar Charolette from spoofed CID # 1-832-689-2751 at 10:21 am soliciting final expense insurance. Call terminated prior to live agent answering. (RC)

r. On or about February 9, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar James from spoofed CID # 1-832-689-5533 at 2:31 pm soliciting final expense insurance and the tele-script followed:

"Hello … Hi this is James .. well the purpose of my call is to inform you that the State has recently approved a new final expense whole life insurance .. what it does.. it is going to cover 100 percent cost of your funeral burials or cremation expenses it will also give you the option to leave some money for your loved ones ….let me ask you this are you between the age of 40 and 80…"

---

[4] "The fact that Plaintiff "plays along" with telemarketing scripts to find out who [they] really are is not deceptive. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation. Shelton v. Nat'l Gas & Elec. LLC. No. 17-4063, 2019 U.D. Dist. LEXIS 59235 @ *12 (E.D. Pa. Apr. 5, 2019).

Upon the final transfer of this call – Plaintiff was merged with foreign sounding agent named Mark who clearly stated that Plaintiff had a insurance policy with them… Plaintiff inquired who the carrier was – Mark responded TruStage. (RC)

s. On or about February 16, 2026, Plaintiff received a unsolicited pre-recorded and/or artificial voice call from avatar Charolette from spoofed CID # 1-832-659-2429 at 4:34 pm soliciting final expense insurance. (RC)

t. On or about February 19, 2026, Plaintiff received a unsolicited call from Tru Stage agent Don Davis from CID # 1-231-261-4999 at 2:27 pm and referred to the coverage amount of $7,000 and the premium of $35.27 not being paid. (RC) see Exhibit 4 at pg. 15.

**52.** Plaintiff cancelled his final expense insurance policy with TruStage on February 1, 2026, and ended any established business relationship created on January 15, 2026 when Plaintiff purchased the final expense policy as part of his investigation into the barrage of final expense calls he had been receiving. But then again, TruStage nor its telemarketers, subagents or any vendors *should not* have been calling Plaintiff' DNCR phone number while being on the national and State of Texas DNCR in the first place.

**53.** On February 5, 2026, TruStage returned Plaintiff's insurance premium back into Plaintiff's Capital One account. ***See* Exhibit 5**

**54.** Plaintiff further cancelled any and all relationships by sending TruStage a Notice of Intent and within the body of this Notice – Plaintiff wrote "quit, cease and stop calling my phone number listed herein immediately.

**55.** Plaintiff continued receiving the pre-recorded Charolette artificial voice solicitations. Plaintiff sent a second (2nd) Notice of Intent to File Suit on February 18, 2026 and again reiterated to stop calling. The pre-recorded artificial voice Charlotte and James illegal calls finally stopped after the call from TruStage agent named Don Davis on February 19, 2026.

**56.** Doe telemarketers' placement of multiple (20) illegal final expense calls on behalf of TruStage, within a twelve-month period to Plaintiff's DNCR phone number violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c).

**57.** The illegal final expense made upon the behalf of TruStage are clearly evident TCPA violations, such calls were knowing and willful because TruStage and/or its DOE telemarketers had "reason to know, or should have known, that [its] illegal telemarketing conduct would violate the statute." *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001). Bad faith is not required.

**58.** TruStage is acutely aware of the regulations regarding the TCPA and the ethical prohibition surrounding unsolicited direct pre-recorded phone advertising to consumers with whom no preexisting relationship exists.

**59.** TruStage and or its un-registered agent(s), subagent(s) and/or affiliates purposefully availed themselves of the forum state (Texas) by specifically targeting Plaintiff by using Texas area codes to deceive and or trick this plaintiff into thinking their deceptive and harassing robocalls are local. 832 is a local area code in Harris County, Texas. "In addition, "calls to a cell phone can serve as minimum contacts with the state containing the phone's area code when the calls are received there." *Rogers v. Nat'l Car Cure, LLC*, 636 F.Supp.3d 762, 769 (S.D. Tex. 2022).

**60.** The illegal incoming calls that Plaintiff received on behalf of TruStage's un-registered telemarketers and or subagents herein were placed without policies, procedures and training their un-licensed and/or un-registered Doe telemarketers on the use of an internal do-not-call policy and the federal and state's DNCR's.

**61.** On information and belief, TruStage does not train its agents, sub-agents or DOE's who are engaged in telemarketing on their behalf on the use of any state or federal do not call lists, but

rather encourage its telemarketers to violate the TCPA for their financial gain and benefit, and approves, reviewed or participated in developing the telemarketing sales scripts & messages.

**62.** Doe telemarketers for Trustage, subagents, agent(s), 3rd party vendor(s) who made and or delivered such calls on TruStage behalf, participated in, facilitated, directed, authorized, knew and willfully ignored the spoofing, misleading tele-sales practices, while knowing facts that required a reasonable person to investigate further, but for such violations of state and federal TCPA laws. TruStage approved and ratified the conduct of their telemarketers, agents and/or subagents to engage in false and misleading telemarketing practices.

**63.** Moreover, upon information and belief, TruStage's sub-agents and or un-licensed or un-registered DOE telemarketers have falsely and deceptively stated the names of "Senior Benefits" or similar sounding entity names as the name of the company and/or entity calling plaintiff's DNCR phone number, but such names of entities are forged in impersonation, deception and cloaked for the sole purpose to avoid TCPA liability.

**64.** TruStage's DOE un-licensed telemarketer(s), agents and/or subagent(s) have deceptively refused and failed to identify themselves when calling plaintiff's DNCR phone number when asked the identity of the company the telemarketer was calling on behalf, other than giving a false and fictious name.

**65.** The approximately, indirectly and or directly twenty (20) final expense calls made upon TruStage's behalf to Plaintiff 's DNCR phone number were not made for "emergency purposes" but rather to annoy, harass and intrude upon Plaintiff's seclusion and daily life's activities.

**66.** Upon information and belief, TruStage **<u>does not</u>** have a written policy or procedure(s) for maintaining an internal do not call list pursuant to 47 U.S.C. § 64.1200(d)(1). On February 1,

2026, Plaintiff sent TruStage a request for their Do-Not Call policy within his Notice of Intent to File Suit. TruStage utterly failed to respond accordingly on two (2) separate requests with such do not call list policy and or procedure and such failure to respond, indicates and/or implies that TruStage does not have a Do Not Call policy and or procedure in place and chooses to evade the TCPA rules.

**67.** TruStage's Doe telemarketers, sub-agents and or lead generator(s) are not licensed to solicit, quote and or sell life insurance products, transmit, advertise, and or take any other official action in the making or consummation of an insurance contract for or with TruStage, and such TCPA violations that transpired on January 15, 2026 with the Charolette pre-recorded artificial voice calls are in violation of the Texas Insurance Code. TEX. INS. CODE § 4001.051

**68.** Additionally, TruStage's telemarketers, 3rd party vendors, agents who have directly and or indirectly made, facilitated, placed the final expense solicitation calls to Plaintiff's DNCR phone number, have utterly and negligently failed in any adherence to policy and procedure as mandated by the FCC mandated communications that are required to be implemented by TruStage's DOE telemarketers in STIR/SHAKEN in the IP portion of their telemarketing network.

**69.** The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships … through discovery, if they are not independently privy to such information." *In re Dish Network*, 28 FCC Rcd. 6592-93 ¶ 46.

## THEORIES OF LIABILITY

**70.** TruStage is "vicariously liable" under federal common law principles of agency for TCPA violations committed by third-party telemarketers." *In re Joint Pet. filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6582 (2013). Even if TruStage did not personally initiate the TCPA-

violating calls, TruStage is liable because they took steps to cause the calls to be made, and the calls were made pursuant to their actual or apparent authority, and/or ratification. Further, Defendant is liable for participating in a joint enterprise or acting in concert with John Doe. TruStage has knowledge of their Doe's lead generators and or telemarketers placing these calls on their behalf to Plaintiff's DNCR phone number on a harassing and consistent basis but choose to take the Sgt. Schultz defense of "I know nothing."

**71.** TruStage is directly liable under the TCPA for outsourcing their telemarketing to un-registered and/or unlicensed John Doe(s).

**72.** Plaintiff has been unable to ascertain the identity of the John Doe's and has accordingly named John Doe until the identity is revealed in discovery. It should further be noted that the final expense policy purchased by Plaintiff and submitted as Exhibit 4 herein, is void of the name of any insurance agent writing the policy as most standard policies contain the name of the agent selling the policy.

**73.** Upon information and belief, TruStage's unlicensed telemarketer and/or verifier a/k/a product specialist, was the selling insurance agent, as no insurance license is needed overseas to sell life insurance policies within the State of Texas and the TCPA and Insurance laws apparently are not applicable to TruStage's DOE telemarketers when quoting insurance premiums.

**74.** On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief.

As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

## VICARIOUS LIABILITY / AGENCY LIABILITY

**75.** The May 2013 FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107

**76.** The May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." Id. at 6592 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

**77.** In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either 227(b) or section 227(c) that are committed by third-party telemarketers." Id. at 6574 ¶ 1.

## ACTUAL AUTHORITY

**78.** Defendant gave actual authority to John Doe(s) to generate prospective customers via banned prerecorded or artificial voice calls and to place solicitation calls to a phone number on the DNCR.

**79.** Robocalling was integrated seamlessly into their sales process so that it appeared to outside parties like Plaintiff that the John Doe's were the telemarketing department of TruStage.

**80.** Defendant TruStage acted in concert with John Doe's and has been able to enjoy the benefits of illegal telemarketing while moving the illegal activity "outside their purview."

**81.** In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b))

**82.** More specifically, the May 2013 FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶34).

**83.** Given TruStage having hired, directed and controlled the final expense telemarketing by John Doe(s), TruStage gave John Doe(s) actual authority to act as its agent in conducting telemarketing on its behalf.

**APPARENT AUTHORITY**

**84.** The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct

28 FCC Rcd at 6592 (¶ 46).

**85.** Defendants authorized John Doe to generate prospective customers for them.

**86.** It appeared to Plaintiff that John Doe was one and the same company with TruStage.

**87.** John Doe was able to enter information into TruStage's propriety systems and/or databases to process the final expense information, insurance quote, input personal and medical information about Plaintiff into computer systems fully integrated.

**88.** Plaintiff reasonably believed and relied on the fact that John Doe had received permission, authority and instructions from TruStage to advertise and/or promote and market their life insurance products and/or services to Plaintiff.

**89.** TruStage additionally cloaked John Doe(s) with apparent authority to make the final expense telemarketing calls at issue.

## RATIFICATION

**90.** TruStage actively and aggressively accepted final expense business that originated through the illegal telemarketing placed upon their behalf by their lead generating and/or telemarketers John Doe(s).

**91.** By engaging John Doe's to make final expense calls on its behalf to generate new business, TruStage manifested assent to another person … that the agent shall act on the principal's behalf and subject to the principal's control as described in the Restatement (Third) of Agency.

**92.** By sending a corporate TruStage welcome letter dated January 16, 2026 to Plaintiff pursuant to a illegal final expense call, TruStage "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of John Doe, as described in the Restatement (Third) of Agency.

**93.** A principal can make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent

in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement 7 2.03 cmt. c

**94.** Defendants ratified John Doe's TCPA violations by knowingly accepting the benefit of Plaintiff as a new prospect despite the fact Plaintiff had been identified using illegal methods.

**95.** John Doe permitted their salespeople and/or telemarketers to solicit prospective customers for TruStage, including Plaintiff, while turning a blind eye to the illegal way in which the potential prospect was identified.

**96.** TruStage has ratified the final expense telemarketing campaign by allowing telemarketing final expense phone calls with their Charlotte and James prerecorded artificial voice messages.

**97.** Upon information and belief Defendant TruStage knowingly and actively accepted final expense business that originated through the illegal calls placed by their Doe telemarketers.

**98.** Given TruStage's right to control over, and participate in, the final expense telemarketing campaigns at issue, and/or its ratification of the campaign, it is directly and vicariously liable for the violations alleged herein. All of the final expense calls placed by TruStage's DOE telemarketers, were made on behalf of, and for the direct benefit of TruStage.

**99.** TruStage utterly and negligently failed to keep, maintain, implement, coordinate and/or enforce policies and procedures and training to ensure compliance with the TCPA, and/or provide adequate oversight and training to ensure compliance.

**100.** TruStage were part of a common enterprise with its subagents, DOE telemarketers and producers and had a community of interest in promoting TruStage's insurance business pursuant to the illegal telephone telemarketing campaign they bestowed upon this plaintiff.

**101.** Another theory of ratification holds that a principal may be held liable if the principal receives or retains the benefits it generates.

**102.** As a direct and proximate result of Jane/John Doe's illegal phone calls, Plaintiff suffered actual damages, including his wasted time to answer the violating calls, aggravation of the repeated and harassing phone calls, loss of storage space as Plaintiff would take screen shots of the illegal phone calls, constant disruption into his daily activities while being at work, having lunch and or dinner, invasion of his privacy and the nuisance of receiving the calls daily and consecutively.

**THE TEXAS BUSINESS AND COMMERCE CODE § 305.053**

**103.** A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or Subchapter A may bring an action in this state against the person who originates the communication for damages in the amount provided by this section. Tex. Bus. & Com. Code § 305.053(a)(2).

**104.** A plaintiff who prevails in an action for damages under this section is entitled to the greater of $500 for each violation or the plaintiff's actual damages. Tex. Bus. & Com. Code § 305.053(b)(1-2).

**105.** The fact that a claimant has recovered under a private action arising from a violation of this chapter more than once may not limit recovery in a future legal proceeding in any manner. Tex. Bus. & Com. Code § 305.055

**106.** The Plaintiff may seek damages under this Texas law for violations of 47 USC § 227 or subchapter A and seek $500 in statutory damages or $1500 for willful or knowing damages.

**VIOLATIONS OF THE TEXAS BUSINESS AND COMMERCE CODE § 302.101 & § 4001.051 TEXAS INSURANCE CODE**

**107.** Realizing the egregious and particular harm to Texas residents that unsolicited telemarketing calls to citizens of this great State of Texas, the Texas Legislature passed § 302.101 of the Texas Business & Commerce Code, which requires all "sellers" or "salespersons" making "telephone solicitations" inducing a person to "purchase, rent, claim, or receive an item," which includes "a service" to register as such with the Texas Secretary of State. TEX. BUS. & COM. CODE §§ 302.001 *et seq.*

**108.** A telephone solicitor may not make a consumer telephone call to a consumer unless the telephone solicitor, immediately after making contact with the consumer to whom the call is made, identifies himself or herself by name, the business on whose behalf the telephone solicitor is calling, and the purpose of the call. TBCC § 301.051(b)(A-C).

**109.** The final expense telemarketing solicitations and real time quotes that TruStage's foreign accented telemarketer's, agent(s), sub-agents and or representatives made, while calling Plaintiff's DNCR phone number on the times and dates listed, are non-insurance telemarketers and/or sub-agents that are not duly licensed within the United States or the State of Texas to sell any type of insurance products, in violation of state and federal laws, and further do not hold a registration certificate and or bond within the Secretary for the State of Texas to make or solicit any telephone solicitations for final expense products solicited to Texas residents.

**110.** None of the Defendant's un-registered and un-licensed DOE telemarketers and or subagent(s) qualify for an exemption under § 302.053 and may not engage in the selling process of insurance products to consumers within the State of Texas.

**111.** None of the named telemarketers for TruStage are registered with the Texas Secretary of State as required and mandated by the Business & Commerce Code if they (*telemarketers*) are to solicit, provide real time quotes and engage in the sale of TruStage's final expense life insurance products into the State of Texas. *Telephone Solicitors Search,* TEXAS SECRETARY OF STATE, https://direct.sos.state.tx.us/telephone/TelephoneSearch.asp (querying Don Davis, Sam Davis and others).

**112.** Venue for an action brought under this chapter is in the county in which the consumer telephone call was received. TBCC § 301.105(2).

**113.** Under the provisions of Tex. Bus. & Comm. Code § 302.302, plaintiff is allowed to seek damages of up to $5000.00 dollar per each distinct violation of § 302.101

**COUNT I**
**Violation of the TCPA, 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)**
**(Against TruStage & John Doe(s))**

**114.** Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

**115.** The foregoing acts and omissions of these Defendants making twenty (20) non-emergency telemarketing prerecorded and/or artificial voice calls to Plaintiff's DNCR phone number without his express written consent. constitute violations of the TCPA upon the Plaintiff answering these illegal calls and the calls delivering an artificial or prerecorded voice message, 47 U.S.C. § 227(b)(1)(A)(iii). The calls were made for the express purpose of soliciting this Plaintiff for life insurance products sold by TruStage.

**116.** As a result of this unlawful conduct clearly evidenced before the Court, Plaintiff was statutorily damaged at least twenty (20) times under 47 U.S.C. § 227(b)(3)(B) by TruStage's illegal telephone calls described above, in the amount of $500 for each individual violation.

**117.** Plaintiff was further statutorily damaged because TruStage and DOE's willfully and/or knowingly violated this subsection of the TCPA. Plaintiff requests that the Court treble the damages amount as permitted under 47 U.S.C. § 227(b)(3)(C) for this willful and/or knowing violation.

**118.** The TCPA prohibits any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his telephone number on the DNCR of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. § 227(c).

**COUNT II**
**Violation of the TCPA, 47 U.S.C. § 227(b)**
**(Against TruStage and John Doe's)**

**119.** Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

**120.** John Doe placed telephone calls to Plaintiff's DNCR telephone on behalf of TruStage without having Plaintiff's prior express and/or written consent to do so.

**121.** The illegal telemarketing calls were made for the express purpose of soliciting Plaintiff for life insurance products sold by TruStage.

**122.** When Plaintiff answered, the solicitation calls played the artificial voice and/or prerecorded Charolette and James voice messages to Plaintiff's cellular and/or residential phone. 47 U.S.C. § 227(b)(1)(A)(iii) and 47 U.S.C. § 227(b)(1)(B).

**123.** As a result of this unlawful conduct clearly evidenced before the Court, TruStage and John Doe(s) repeatedly invaded Plaintiff's personal privacy, and under 47 U.S.C. § 227(b)(3)(B), entitling them to recover $500 in civil fines for each violation and an injunction requiring TruStage and its DOE telemarketers to stop their illegal calling campaign.

**124.** TruStage and/or their agent made the violating calls "willfully" and/or "knowingly" under 47 U.S.C. § 227(b)(3)(C).

**125.** Plaintiff requests that the court treble the award from $500 to $1500 per violation under 47 U.S.C. § 227(b)(3)(C) for willful and/or knowing conduct.

**Count III**
**Violation of the Telephone Consumer Protection Act**
**Failure to Honor Do-Not-Call Request**
**47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)**

**126.** Plaintiff incorporates by reference each and every paragraph of this complaint as if fully set forth herein.

**127.** The TCPA and its accompanying regulations impose an affirmative obligation upon entities engaged in telemarketing to honor consumer requests to cease such solicitations. See 47 C.F.R. § 64.1200(d)(6).

**128.** Specifically, 47 C.F.R. § 64.1200(d)(6) requires a "person or entity making calls for telemarketing purposes" to "maintain a record of a consumer's request not to receive further telemarketing calls" and honor said request "for 5 years from the time the request is made."

**129.** On numerous occasions, Plaintiff expressly and unequivocally instructed TruStage's telemarketers to stop contacting him and place his number on their internal do-not-call list. Each of these verbal instructions constituted a legally effective do-not-call request pursuant to 47 C.F.R. § 64.1200(d) and 47 C.F.R. § 64.1200(c)(2)

**130.** Notwithstanding Plaintiff's clear requests, TruStage's telemarketers and or lead generator(s) chose to ignore them and continued to initiate and place illegal telemarketing calls to Plaintiff's DNCR phone number while acting upon TruStage's behalf in soliciting their final expense insurance products.

131. As a result of Defendants' failure to implement, maintain, and honor an internal do-not-call list, and/or their intentional decision to disregard Plaintiff's various DNC requests, Plaintiff is entitled to statutory, actual, and treble damages against TruStage.

**Count IV**
**(Violations of the Texas Business & Commerce Code § 302.101)**
**Failure to obtain a Telephone Solicitation Registration Certificate**
**(Against TruStage and John Doe(s))**

132. All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

133. Texas Bus. & Com. Code § 302.101 require telemarketers to obtain a registration certificate... for the business location from which the solicitation is made.

134. Texas Bus. & Com. Code § 302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

135. On information and belief, not one of Defendant TruStage and/or DOE's do not hold the required Texas Telemarketer Registration Certificate for any of the twenty (20) separate instances when such illegal final expense calls were placed to Plaintiff's DNCR phone number.

136. Plaintiff may exercise a private right of action under Tex. Bus. & Com. Code § 17.50.

137. Plaintiff seeks an award of $5,000 per violation

138. Plaintiff seeks a permanent injunction requiring TruStage and it's telemarketers to cease placing telemarketing calls to Plaintiff without a registration certificate.

**Count V**
**(Violations of the Texas Business and Commerce Code § 305.053)**
**Texas State TCPA Law**

**139.** All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein

**140.** Texas Bus. & Com. Code § 305.053 creates a right of action for "a person who receives a communication that violates [the TCPA as codified at] 47 U.S.C. Section 227 [or] a regulation adopted under that provision ... against the person who originates the communication .... " Tex. Bus. & Com. Code § 305.053(a).

**141.** Therefore, the elements of a § 305.053 claim "correspond to the necessary elements for a TCPA claim." *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021).

**142.** Plaintiff also requests the Court award treble damages based on Defendants' knowing and/or intentional violations under § 305.053(c)(1) for a total of up to $1,500 per call under this Count.

**143.** Pursuant to Tex. Bus. & Com. Code § 305.053(b), Plaintiff is entitled to recover the greater of his actual damages or $500 for each and every violation.

**COUNT VI**
**Violations of Texas Business and Commerce Code § 304.151(b)(3)**
**Spoofed Caller Identification**

**144.** All paragraphs of this Complaint are expressly adopted and incorporated herein as though fully set forth herein.

**145.** In making a telemarketing call, a telemarketer may not cause misleading information to be transmitted to a recipient's caller identification service or device to otherwise misrepresent the origin of a telemarketing call. Tex. Bus. & Com. Code § 304.151(b)(3).

**146.** DOE's on behalf of TruStage, sent, delivered and or initiated at least twenty (20) illegal final expense phone calls to Plaintiff's caller identification service utilizing a spoofed area code number and/or a 832 area code number.

**147.** The consumer may bring a civil action based on the second or subsequent violation of Subchapter B if the consumer has notified the telemarketer of the alleged violation. Tex. Bus. & Com. Code § 304.257(a)(1).

**148.** If the consumer brings an action based on a violation of Section 304.052 and the court finds that the defendant willfully or knowingly violated that section, the court may award damages in an amount not to exceed $500 for each violation. Tex. Bus. & Com. Code § 304.257(b).

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief against TruStage and John Doe(s):

A. Leave to amend this Complaint should additional Doe's become known and/or identified and to conform to the evidence presented at trial;

B. A declaration that TruStage's and DOE's actions, as set out above, violated the TCPA and Texas state law;

C. A declaration that TruStage's and DOE's illegal telemarketing actions, as set out above, violate the TCPA willfully and knowingly;

D. An order declaring that Defendants' actions, as set out above, violate Texas Bus. & Com. Code § 302.101;

E. An award of $5,000 per call in statutory damages arising under Texas Bus. & Com. Code § 302.101 for twenty (20) calls to Plaintiff's DNCR phone number;

F. An award awarding trebling damages to $1,500 per violation under 47 U.S.C. § 227(b)(3) and § 305.053(c)(1);

G. An injunction requiring TruStage and their telemarketers to cease all unlawful calls.

H. An award of damages, including punitive damages, and costs and attorney fees should Plaintiff retain counsel in the future of this litigation and/or prior to trial;

I. Such other and further relief that the Court deems reasonable and just.

**Demand for a Jury Trial**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

Timothy Aguilar
Pro Se
2807 Randolph Road
Pasadena, Texas 77503
832-689-7311
proselitigationtx@gmail.com

# National Do Not Call Registry - Your Registration Is Confirmed

From: verify@donotcall.gov

To: locateutoday@aol.com

Date: Saturday, May 11, 2024 at 04:16 PM CDT

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 7311 on September 29, 2011. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.

PLAINTIFF'S EXHIBIT
Number 1

Texas "No Call Lists"

# Search Consumer Registration

## Registration Information

Telephone Number: 832-689-7311
Amount: $0.00
Method of Payment: Credit Card

List: Statewide "Do Not Call" List
Status: Registered 8/16/2023 - Expires 8/16/2026

Search Another Registration

Consumer Information

Public Utility Commission of Texas | Texas "No Call Lists" Home | Texas Electric Choice

PLAINTIFF'S EXHIBIT
Number 2




PLAINTIFF S EXHIBIT

Number 3

[redacted]

TruStage™

# TruStage™ insurance policy

Issued by MEMBERS Life Insurance Company

**Please review your policy and save it in a secure place.**

## Filing a claim

By phone: 888.787.8243
By web: consumerclaim.trustage.com
By email*: trustageclaims@trustage.com
By mail: TruStage Insurance
MEMBERS Life Insurance Company
PO Box 61
Waverly, IA 50677-0061

When filing your claim, please provide the following information:

- insured's name
- insured's date of birth
- insured's date of death, or accidental injury
- policy number(s), and
- evidence of death (a death certificate or in most cases, an online obituary), or accidental injury.

If you're not the beneficiary, you may be asked for the beneficiary's contact information.

Please note: Policies in force for two years or less will require additional documentation for claim review.

*To protect your and the insured's privacy, we encourage you to send your documentation via the secured email of your preference. Sending an email or attachments is not secure unless you take the extra step to send it via a secure method.

0969



PLAINTIFF S EXHIBIT
Number 4 pg 1

TruStage™ | MEMBERS Life Insurance Company

**Have a complaint or need help?**

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**MEMBERS Life Insurance Company**

To get information or file a complaint with your insurance company or HMO:

**Call: MEMBERS Life Insurance Company at 800.798.5500**

**Toll-free: 800.798.5500**

Email: CorpCompliance@trustage.com

To protect your privacy, do not include policy details in your email as this email address is not monitored. You will receive an email reply with instructions on how to safely correspond online.

Mail: MEMBERS Life Insurance Company, 2000 Heritage Way, Waverly, IA 50677

**The Texas Department of Insurance**

To get help with an insurance question or file a complaint with the state:

Call with a question: 800.252.3439

File a complaint: www.tdi.texas.gov

Email: ConsumerProtection@tdi.texas.gov

Mail: MC: CO-CP, Texas Department of Insurance, P.O. Box 12030, Austin, TX 78711-2030

**¿Tiene una queja o necesita ayuda?**

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañia de seguros o HMO. Si no puede resolver el problema, es posible que el Departamento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departamento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañia de seguros o HMO. Si no lo hace, podria perder su derecho para apelar.

**MEMBERS Life Insurance Company**

Para obtener información o para presentar una queja ante su compañia de seguros o HMO:

**Llame a: MEMBERS Life Insurance Company at 800.798.5500**

**Teléfono gratuito: 800.798.5500**

Correo electrónico:

CorpCompliance@trustage.com

Para proteger su privacidad, no incluya detalles de la póliza en su correo electrónico, ya que esta dirección de correo electrónico no cuenta con supervisión. Recibirá una respuesta por correo electrónico con instrucciones sobre cómo responder en línea de manera segura.

Dirección postal: MEMBERS Life Insurance Company, 2000 Heritage Way, Waverly, IA 50677

**El Departamento de Seguros de Texas**

Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:

Llame: 800.252.3439

En línea: www.tdi.texas.gov

Correo electrónico: ConsumerProtection@tdi.texas.gov

Dirección postal: MC: CO-CP, Texas Department of Insurance, P.O. Box 12030, Austin, TX 78711-2030

*TruStage™ Insurance is issued by MEMBERS Life Insurance Company*



P.O. Box 61 ▪ Waverly, IA 50677-0061 ▪ 888.787.2243 ▪ www.trustage.com

PLAINTIFF'S EXHIBIT

Number 4 pg 2

TruStage | MEMBERS Life Insurance Company

P.O. Box 61 • 2000 Heritage Way
Waverly, IA 50677-0061
800.779.5433 or Visit www.trustage.com

# WHOLE LIFE INSURANCE POLICY

POLICY NUMBER: MC2671141

**THIS IS A LEGAL CONTRACT.** We promise to pay the proceeds and to provide the benefits described in this policy if all its terms and conditions are met. This policy is issued to the Owner based on your application and in exchange for timely payment of premiums.

**PLEASE READ YOUR POLICY CAREFULLY.**

## TABLE OF CONTENTS

Right to Examine Policy.......... Cover Page
Policy Data Page
Definitions .......... Section 1
Premiums .......... Section 2
Coverage Provided.......... Section 3
Payment of Proceeds .......... Section 4
Beneficiary.......... Section 5
Owner.......... Section 6
Loans.......... Section 7
Cash Value and Policy Surrender.......... Section 8
General Provisions.......... Section 9
Nonforfeiture Provisions.......... Section 10
Settlement Options.......... Section 11
Endorsement(s), if any

**YOUR RIGHT TO EXAMINE THIS POLICY:** If for any reason you decide not to keep this policy, you have 30 days (or the number of days required by applicable law in the state where the policy is delivered, if more than 30) to return it or notify us that you do not want to keep it. You may return it or notify us or the agent who sold it to you. This 30-day period will begin on the date you received the policy, or the date we receive the initial premium, if later. We will refund any premiums paid, including any fees or charges. The policy will be void from the start and will be treated as if it had not been issued.

Signed for MEMBERS Life Insurance Company on the effective date.

Tammy R Schultz

**President**

**Secretary**

**INDIVIDUAL WHOLE LIFE INSURANCE POLICY**
Death Proceeds Payable at the Insured's Death or Policy Maturity
Policy Matures at Age 121 Policy Anniversary
This Policy is Non-Participating – Does Not Pay Dividends

**PLAINTIFF S EXHIBIT**
Number 4 pg 3

**POLICY DATA PAGE** **POLICY NUMBER:** MC2671141

**INSURED:** TIMOTHY A AGUILAR
**ISSUE AGE:** 60
**GENDER:** Male
**EFFECTIVE DATE:** 1/15/2026
**FACE AMOUNT:** $7,000
**OWNER(S):** TIMOTHY A AGUILAR

| Policy | Amount of Insurance | Premium Payable | Premium Class |
|---|---|---|---|
| Whole Life Policy | $7,000 | To Age 121 Policy | Standard |

| Initial Premium | Monthly Automatic Payment | Monthly Direct Bill Payment | Quarterly Automatic or Direct Bill Payment | Semi-Annual Automatic or Direct Bill Payment | Annual Automatic or Direct Bill Payment |
|---|---|---|---|---|---|
| Whole Life Policy | $35.27 | $35.27 | $105.81 | $211.62 | $423.24 |
| TOTAL PREMIUM: | $35.27 | $35.27 | $105.81 | $211.62 | $423.24 |

The policy premiums shown above include an annual policy fee of $36.00.

**Guaranteed Rate of Interest to Calculate Guaranteed Policy Values:** 3.75%

**Jurisdiction of Issue:** TX **Department Telephone Number:** 800.252.3439



**PLAINTIFF S EXHIBIT**
Number 4 pg. 5

**POLICY DATA PAGE continued**

The values shown in the table below are the guaranteed values provided by the policy. These values reflect the nonforfeiture options of this policy described in Section 10. Values are based on the length of time your policy has been in force and the Insured's Age at issue. The values shown assume the premium has been paid in full for each Policy Year and there is no Indebtedness. Any Indebtedness will result in a reduction of your values. We will allow for partial years in determining values.

Values for Policy Years not shown in the table will be furnished upon request.

**TABLE OF GUARANTEED POLICY VALUES**

| End of Year | Cash Value or Loan Value | Reduced Paid-Up Insurance | Extended Term Period | |
|---|---|---|---|---|
| | | | Years | Days |
| 1 | $0.00 | $0.00 | 0 | 0 |
| 2 | $35.98 | $78.12 | 0 | 313 |
| 3 | $213.29 | $449.48 | 4 | 51 |
| 4 | $393.61 | $805.40 | 6 | 171 |
| 5 | $577.01 | $1,146.82 | 8 | 44 |
| 6 | $763.42 | $1,474.33 | 9 | 98 |
| 7 | $953.12 | $1,789.14 | 10 | 35 |
| 8 | $1,145.90 | $2,091.47 | 10 | 252 |
| 9 | $1,341.76 | $2,381.98 | 11 | 43 |
| 10 | $1,540.28 | $2,660.65 | 11 | 145 |
| 11 | $1,740.76 | $2,927.20 | 11 | 205 |
| 12 | $1,942.64 | $3,181.72 | 11 | 231 |
| 13 | $2,145.01 | $3,423.89 | 11 | 227 |
| 14 | $2,347.31 | $3,654.00 | 11 | 198 |
| 15 | $2,549.05 | $3,872.40 | 11 | 148 |
| 16 | $2,750.02 | $4,079.73 | 11 | 79 |
| 17 | $2,950.15 | $4,276.73 | 10 | 359 |
| 18 | $3,149.44 | $4,464.21 | 10 | 264 |
| 19 | $3,347.40 | $4,642.33 | 10 | 160 |
| 20 | $3,543.47 | $4,811.33 | 10 | 45 |
| Age 95 | $5,652.50 | $6,264.00 | 5 | 288 |
| Age 121 | $7,000.00 | $0.00 | N/A | N/A |

**Basis for Calculating Guaranteed Policy Values**: The guaranteed policy values and net single premium rates for reduced paid-up insurance and extended term insurance are calculated using the 2017 Commissioners' Standard Ordinary, Gender Distinct, Tobacco/Non-Tobacco Distinct, Ultimate, Age Last Birthday Mortality Tables, using semi-continuous actuarial functions with interest at 3.75%. Computations assume the premium payment is annual and the death proceeds are payable at the moment of death. The guaranteed values for this policy are not less than those required by the NAIC Standard Nonforfeiture Law for Life Insurance, model #808.

PLAINTIFF S EXHIBIT
Number 4 pg 6

## SECTION 1. DEFINITIONS

**1.01 What are the most commonly used terms and what do they mean?**

**Age.** The Insured's age at issue is his or her age as of their last birthday. An Insured's Age under the policy will be increased by one year on each Policy Anniversary thereafter.

**Authorized Request.** A request sent by the Owner to us. An Authorized Request must be in a form satisfactory to us and must be received at our administrative office. We may consent to receiving requests electronically or by telephone.

**Beneficiary, Beneficiaries.** The person(s) (or entities) who will receive the death proceeds due to the Insured's death.

**Company.** MEMBERS Life Insurance Company. Also referred to as "we", "our" and "us".

**Face Amount.** The amount of insurance coverage stated on the Policy Data Page.

**Indebtedness.** The amount of your loan(s) plus accrued interest on the loan(s).

**Insured.** The person whose life this policy insures. The Insured is shown on the Policy Data Page.

**Irrevocable Beneficiary.** A Beneficiary who has certain rights that cannot be changed unless he or she consents to the change.

**Legal Partner.** The person with whom you have entered into a legally-sanctioned domestic partnership or civil union that grants you the same rights, responsibilities, and obligations as opposite-sex married couples in accordance with applicable state laws.

**Maturity Date.** The Policy Anniversary on or immediately following the Insured's 121st birthday.

**Modal Period.** A period of time that is based on the premium payment frequency elected by you. You may elect to pay your premium every month, every three months (quarterly), every six months (semi-annually) or every 12 months (annually).

**Net Cash Value.** Your cash value less any Indebtedness.

**Owner.** The person(s) (or entity) who owns this policy. The Owner is shown on the application, unless later changed as allowed by this policy. If no Owner is named, then the Insured is the Owner. The Owner is also referred to as "you", "your" or "yours".

**Policy Anniversary.** The same day and month as the effective date for each succeeding year your policy remains in force.

**Policy Year.** The 12-month period ending on any Policy Anniversary.

**Premium Class.** The classification which, along with the insured's age and gender, will determine the premium that is charged. The insured's premium class is shown on the Policy Data Page.

**Proof of Death.** Proof of Death satisfactory to us. Such proof will consist of a certified copy of the death certificate of the Insured, or other lawful evidence providing equivalent information and proof of the claimant's interest in the proceeds.

**Spouse.** The Insured's lawful Spouse. For the purposes of this policy, Spouse includes the person with whom the Insured has entered into a legally-sanctioned marriage, domestic partnership or civil union arrangement that grants the same rights, responsibilities, and obligations as married couples in accordance with the applicable state laws.

## SECTION 2. PREMIUMS

**2.01 What are the premiums for your coverage?** Your premium is shown on your Policy Data Page. Premiums are payable during the Insured's lifetime until the Policy Anniversary that coincides with the Insured's age 121 under the policy. Premiums may be impacted by the method of payment you elect.

**2.02 When are premiums due and where are premiums paid?** All premiums must be paid during the Insured's lifetime and received by us on or before the date they are due. The initial premium is due on the effective date of insurance. Successive premiums are due on the first day of each successive Modal Period. Premiums must be paid to us at our designated office.

PLAINTIFF S EXHIBIT
Number 4 pg 7

2.03 **Can the premium be paid after the date it is due?** You have 31 days beyond the due date to pay your premium. This is called the grace period. Your policy will continue in force during the grace period. Any payments sent by mail must be postmarked on or before the end of the grace period. If the Insured dies during this period, we will deduct the premium for this 31-day grace period from the death proceeds. This 31-day grace period does not apply to the initial premium payment.

2.04 **What happens if a premium is not paid before the end of the grace period?**
If a premium is not paid before the end of the 31-day grace period, one of the following will occur:

a.) If your policy has no cash value, your coverage will terminate;
b.) If your policy has cash value and the automatic premium loan option is in effect, an automatic premium loan will occur as described in Section 7.03; or
c.) If your policy has cash value and the automatic premium loan option is not in effect, one of the nonforfeiture options will apply, as described in Section 10.

2.05 **Can your policy be reinstated?** If your policy lapses or is in force under a nonforfeiture option, you may ask us to reinstate your policy within three years of the last premium due date. In order to do so, we will require the following:

a.) Your Authorized Request for reinstatement during the Insured's lifetime;
b.) Evidence of insurability which is satisfactory to us;
c.) Payment of all past due premiums plus interest, at a rate not to exceed 6% per year; and
d.) Payment or reinstatement of any Indebtedness which existed prior to reinstatement.

## SECTION 3. COVERAGE PROVIDED

3.01 **What is the coverage provided by this policy?** This policy provides whole life insurance for persons who become insured. Death proceeds are payable to your Beneficiary if the Insured dies while covered under this policy. If the Insured is living at the Maturity Date, the maturity proceeds will be paid to you. Your policy may also be surrendered for its Net Cash Value as described in Section 8.02 at any time prior to the Maturity Date.

3.02 **When will insurance coverage begin?** The coverage provided by this policy takes effect only after the following:

a.) We receive and approve your written application; and
b.) We have received the initial premium.

Coverage on the Insured then takes effect on the effective date shown on the Policy Data Page.

If we do not receive an initial premium with the application, there is no insurance in effect until we receive your initial premium. Your initial premium must be received on or before the premium due date. If this initial premium is not paid on or before the premium due date, your policy will be deemed void and your application for insurance will be withdrawn. Any premium received after the premium due date will be refunded to you.

3.03 **Can the Face Amount be increased or decreased?** The Face Amount cannot be increased after the policy effective date. The Face Amount may be decreased after the effective date by Authorized Request, subject to the following:

a.) The Face Amount, after the decrease, cannot be less than the minimum amount required to issue this policy;
b.) The cash value of the policy will be reduced in proportion to the decrease in the Face Amount; and
c.) Any Indebtedness will be repaid at the time of the decrease, to the extent possible, using the policy's cash value that is attributable to the decrease in the Face Amount. Any Indebtedness that is not repaid (because such cash value is insufficient to repay the entire amount) will be continued in the policy.

PLAINTIFF'S EXHIBIT
Number 4 pg 8

The cash value that is attributable to the decrease in the Face Amount, minus the amount required to repay any Indebtedness, will be paid to you. We reserve the right to suspend or discontinue the option to decrease the Face Amount at any time. Suspension or discontinuance of this right will be administered in a non-discriminatory manner.

3.04 **When will insurance coverage end?** The coverage provided by this policy will end automatically on the earliest of:

a.) The date of the Insured's death;
b.) The date we receive your Authorized Request to terminate or surrender your policy;
c.) The date the grace period ends without a premium payment and the policy has no cash value;
d.) The date your Indebtedness equals or exceeds the cash value of the policy, as described in Section 7.01;
e.) The date the nonforfeiture option ends, if your coverage is in force as extended term insurance; or
f.) The Maturity Date.

## SECTION 4. PAYMENT OF PROCEEDS

4.01 **When do death proceeds become payable?** The death proceeds become payable to the Beneficiary on file at our administrative office when we receive Proof of Death of the Insured.

4.02 **What amount is payable as death proceeds?** The amount of death proceeds payable to your Beneficiary will be determined as of the date of the Insured's death.

The death proceeds will be equal to:

a.) The Face Amount;
b.) Plus any portion of any premium paid beyond the Insured's date of death;
c.) Minus any portion of any premium due as of the Insured's date of death;
d.) Minus any Indebtedness.

We will pay interest on death proceeds from the date of the Insured's death until the date of payment, regardless if the death proceeds are based on the Face Amount or premiums paid. Interest will be paid at an annual rate equal to the current interest rate in effect on the date of death for proceeds left on deposit with us, or if we have not established a rate for funds left on deposit, at the Two Year Treasury Constant Maturity Rate as published by the Federal Reserve. In determining the effective annual rate or rates, we will use the rate in effect on the date of death.

Payment will be made within 31 calendar days of the latest of the following:

a.) The date we receive Proof of Death;
b.) The date we receive sufficient information to determine liability, the extent of the liability, and the appropriate payee legally entitled to the proceeds; or
c.) The date that any legal impediments to payment of proceeds that depend on the action of parties other than us are resolved and sufficient evidence of the same is provided to us. Legal impediments to payment include, but are not limited to: 1.) The establishment of guardianships and conservatorships; 2.) The appointment and qualification of trustees, executors and administrators; and 3.) The submission of information required to satisfy state and federal reporting requirements.

In the event payment is postponed for more than 31 calendar days from the latest of items (a), (b) or (c) above, the annual rate of interest during the period of postponement (beginning on the 32nd day until the date of payment) will be equal to the interest rate described above, plus 10%.

4.03 **How are death proceeds paid?** The death proceeds are paid in a single sum unless a settlement option has been selected. We reserve the right to pay proceeds to an estate or other entity in a single sum. Payment is subject to the rights of any assignee of record.

PLAINTIFF S EXHIBIT
Number 4 pg 9

You may select a settlement option while the Insured is living by Authorized Request. The written consent of each Irrevocable Beneficiary and assignee, if any, will be required at the time of selection.

Generally, a Beneficiary can select a settlement option only after the Insured's death. However, you may designate that a Beneficiary is not permitted to change a settlement option you have selected.

4.04 **When do maturity proceeds become payable and what is the amount payable?** The maturity proceeds of this policy become payable to you if the Insured is living on the Maturity Date.

The amount payable as maturity proceeds is equal to the Face Amount shown on your Policy Data Page (or the amount of reduced paid up insurance, if applicable), minus any Indebtedness.

## SECTION 5. BENEFICIARY

5.01 **Who is the Beneficiary?** The Beneficiary is named on your application, unless later changed as allowed by this policy.

There are different classes of Beneficiaries called primary and contingent. There can be more than one Beneficiary per class. The primary Beneficiaries will be paid equally unless otherwise specified. If there is no primary Beneficiary listed or all primary Beneficiaries predeceased the Insured, proceeds will be paid equally, unless otherwise specified, to the contingent Beneficiaries.

If no primary or contingent Beneficiary outlives the Insured, or if there is no named Beneficiary, the death proceeds will be paid in the following order:

a.) The Insured's Spouse or Legal Partner, if living; otherwise
b.) Equally to the Insured's living lawful children, if any, as of the Insured's date of death, regardless of their age; otherwise
c.) To the Insured's estate.

The term "lawful children" includes the Insured's stepchildren, children born to the Insured, and the Insured's legally adopted children (or pending finalization of proposed adoption). Lawful children of the Insured's Legal Partner are considered the Insured's stepchildren.

5.02 **Can the Beneficiary be changed?** Unless you indicate that the Beneficiary cannot be changed without the Beneficiary's consent (an Irrevocable Beneficiary), you can change the Beneficiary at any time by Authorized Request. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request.

A request for change of Beneficiary will, unless otherwise specified by you, take effect as of the date you signed the request. However, we will not be responsible for any payment made or other action taken before we record the request.

## SECTION 6. OWNER

6.01 **Who is the Owner?** The Insured is the Owner unless it is otherwise specified in the application or subsequently changed as allowed under this policy. All the rights allowed under the policy may be exercised solely by the Owner.

If the Insured is not the Owner, ownership will pass automatically to the Insured on the date of the Owner's death. A change of ownership due to the death of the Owner will take effect on the date we receive Proof of Death.

In the event there is more than one Owner:

a.) All elections and other actions that may be taken by the Owner, according to the terms of the policy, require joint action by all such persons; and
b.) Death of Owner refers to the death of the last living Owner.



PLAINTIFF'S EXHIBIT
Number 4 pg 10

6.02 **What are the Owner's rights and how does he or she exercise his or her rights?** Ownership rights include changing ownership, changing Beneficiaries, assigning the policy, and exercising all other rights and privileges allowed by the policy. Ownership rights may be exercised only during the Insured's lifetime by Authorized Request.

6.03 **How is ownership of this policy changed?** A change of Owner may be made at any time before the Insured's death by Authorized Request. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request. The request for change of Owner, unless otherwise specified by you, will take effect as of the date the request was signed. The change will be subject to any payment made or action taken before the request is recorded.

## SECTION 7. LOANS

7.01 **Are loans available?** While your policy is in force, an amount up to the loan value may be borrowed during the Insured's lifetime by Authorized Request. Loans cannot be made if your policy is in force as extended term insurance. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, is required as part of such Authorized Request. Your policy is the sole security for the loan. Any Indebtedness will reduce the amount payable upon surrender, death or maturity.

The loan value will be determined as of the loan date. The loan date is the date we process the loan request. We reserve the right to postpone making the loan for up to six months unless it is to be used under the automatic premium loan option.

Interest on the loan accrues daily and becomes a part of the loan. The interest rate we charge for loans may be changed, but not more often than once a year. The rate, if changed, will never be more than 8% per year and will apply only to loans made on or after the effective date of the rate change.

While your policy is in force, any Indebtedness may be repaid. If your total Indebtedness equals or exceeds your cash value, coverage will terminate and your policy will become void. A notice will be mailed to the last known address of the Owner and any assignee at least 30 days prior to termination of your coverage.

7.02 **What is the maximum amount available for a loan?** The maximum amount available for a loan is referred to as the loan value. Your loan value is equal to:

a.) Your cash value as of your next Policy Anniversary;
b.) Minus any existing Indebtedness;
c.) Minus loan interest to the next Policy Anniversary;
d.) Minus any premiums due and unpaid as of the loan date;
e.) Minus premiums payable, if any, from the loan date to the next Policy Anniversary.

The cash value (described in item a. above) is calculated assuming that all premium payments are made to your next Policy Anniversary.

7.03 **What is the automatic premium loan option?** The automatic premium loan option allows a loan to be made automatically to pay each premium unpaid at the end of the grace period. If the loan value is not sufficient to pay the past due premium (based on your current payment mode), we will change your payment mode to a more frequent mode, and a loan will be made to pay the past due premium. If the loan value is not sufficient to pay at least one monthly premium, the automatic premium loan option will not be available.

You may select or cancel this option by Authorized Request before the due date of any unpaid premium.



PLAINTIFF S EXHIBIT
Number 4 pg 11

## SECTION 8. CASH VALUE AND POLICY SURRENDER

8.01 **What is the cash value of your policy?** The cash value of your policy, when all premiums due have been paid, is the guaranteed cash value shown on the Table of Guaranteed Policy Values on your Policy Data Page. The table shows the guaranteed cash value on certain Policy Anniversaries. Cash values can be calculated at any time during a Policy Year. In that case, allowance will be made for the period of time since the last Policy Anniversary and for any premiums paid for any part of that Policy Year.

The basis for calculating the cash value is shown on the Policy Data Page. We have filed a detailed description of the method used to calculate the guaranteed policy values with the Interstate Insurance Product Regulation Commission.

8.02 **Can your policy be surrendered?** Your policy may be surrendered for its Net Cash Value by Authorized Request. Even if your policy is in force as extended term insurance or reduced paid-up insurance, it will have a cash value and can be surrendered at any time. If your policy becomes paid up by completion of all premium payments, we will pay the cash value upon surrender. The Authorized Request of each Irrevocable Beneficiary and assignee, if any, will be required as part of such Authorized Request for surrender.

The surrender date of your policy is the date we receive your Authorized Request. The Net Cash Value will be determined as of the surrender date. If the surrender date is within 30 days following a Policy Anniversary the cash value used to determine the Net Cash Value will not be less than the cash value on that Policy Anniversary. Any premium paid beyond the surrender date will be returned with the Net Cash Value. Your coverage under this policy will terminate as of the surrender date and your policy will become void.

We reserve the right to postpone payment for up to six months from the date we receive your request to surrender your policy.

## SECTION 9. GENERAL PROVISIONS

9.01 **What does the entire contract consist of?** This policy, any attached riders, endorsement(s), and/or amendments, and any application attached to the policy, are the entire contract between you and us.

No one except a Company officer can change or give up any of the rights or requirements in this policy. Any change must be in writing.

We will accept statements made in any application or reinstatement application, in the absence of fraud, to be representations and not warranties.

9.02 **When does your policy become incontestable?** This policy is incontestable after it has been in force during the Insured's lifetime for two years from the effective date or reinstatement date. Statements made in the application or reinstatement application will not be used by us to void your policy or challenge a claim, unless the statement is material, is contained in your application that is attached to your policy, and within the contestable period.

After this 2-year period, we cannot contest coverage except for:
a.) Non-payment of premiums; or
b.) Fraud in the procurement of the policy or reinstated policy, if permitted by applicable law in the state where the policy is delivered.

If this policy is void as a result of a contest, the premiums you paid for this policy will be refunded to you without interest.

9.03 **What if the Insured's Age or gender has been misstated?** If the Insured's Age or gender is misstated, we will adjust the amount payable and other benefits. This adjustment will be based on what the most recent premium paid would have purchased at the correct Age or gender. If the correct Age is not within the issue Age range for this policy, the premium and benefits will be determined by us using extrapolation. Extrapolation is a method of mathematically calculating the values in a logical manner, based on the known values.

PLAINTIFF S EXHIBIT
Number P.S. 12

9.04 **Can your benefits be assigned?** You may assign the benefits provided by this policy. In order for us to honor the assignment, we must receive notice of your assignment which includes your signature as well as that of each Irrevocable Beneficiary. Assignments, unless otherwise specified by you, will take effect on the date the notice of assignment is signed by you, subject to any payments made or action taken by us prior to receipt of notice. We are not responsible for the validity or effect of the assignment.

9.05 **Is there a reduction in benefits for deaths caused by suicide?** Suicide by the Insured, while sane or insane, within two years of the policy effective date or reinstatement date will result in reduced death proceeds. If the Insured dies by suicide during this 2-year period, the death proceeds payable to your Beneficiary will be limited to the premiums paid, less any Indebtedness.

9.06 **Who approved this policy?** This policy was approved under the authority of the Interstate Insurance Product Regulation Commission Standards (IIPRC) and issued under the commission standards. Any provision within this policy that is in conflict with the IIPRC standards for this product type is hereby amended to conform to the IIPRC standards for this product type as of the policy's effective date.

9.07 **Can we modify your policy?** Your policy may be modified by us if such modification is necessary to comply with the Internal Revenue Code or any other applicable law, regulation or interpretation in order to continue treatment of the policy as life insurance. We will notify you if such modification is required. When required by law, we will obtain your approval and the approval from the appropriate regulatory authority for such modification(s).

## SECTION 10. NONFORFEITURE OPTIONS

10.01 **What are your nonforfeiture options?** If you terminate this policy or stop paying premiums after your policy has cash value, you may elect one of the nonforfeiture options described below by Authorized Request. The written consent of each Irrevocable Beneficiary and assignee, if any, is required as part of such Authorized Request.

If no Authorized Request is received from you within 60 days after the premium due date, the automatic nonforfeiture option will be Option 1, Extended Term Insurance.

Allowance for the period of time since the last Policy Anniversary and for any premiums paid since the preceding Policy Anniversary will be included in the calculation of the value that is applied to a nonforfeiture option.

**Option 1: Extended Term Insurance.** Your Net Cash Value will be used to purchase extended term insurance. The amount of the term insurance will be equal to the Face Amount shown on your Policy Data Page less any Indebtedness. The length of the term period will be determined as of the due date of the unpaid premium. It will be based on your Net Cash Value and the net single premium at the Insured's Age on that date.

**Option 2: Reduced Paid-Up Life Insurance.** Your cash value will be used to purchase paid-up insurance with the same Maturity Date as the policy. The amount of the paid-up insurance will be what the cash value can buy as a net single premium, based on the Insured's Age as of the due date of the unpaid premium. Any Indebtedness that is not repaid at the time of the change to reduced paid-up insurance will be continued on the reduced paid-up policy.

**Option 3: Surrender For Cash.** You may surrender your policy for its Net Cash Value as provided in Section 8.



PLAINTIFF S EXHIBIT
Number 4 pg 13

## SECTION 11. SETTLEMENT OPTIONS

11.01 **What are the optional modes of settlement at the Insured's death?** The settlement mode for the payment of proceeds will be a lump sum, however, other options for mode of settlement are described below or may be available upon agreement between you and us. The minimum amount which can be applied under these options is the greater of $2,000, or the amount required to provide monthly payments of $25. If an optional mode of settlement is not selected before the Insured's death, your Beneficiary may make such selection by Authorized Request.

For Option 1 and Option 2, rates will be provided upon request. Current rates will not be less than the rates that would be offered by us if the proceeds were used to purchase a single premium immediate annuity.

**Option 1 – Installment Option.** We will pay equal monthly payments for a chosen number of years, not less than 5 nor more than 30. If the original payee (your Beneficiary) dies before payments have been made for the chosen number of years:

a.) Payments will be continued for the remainder of the period to the successor payee; or
b.) The present value of the remaining payments, computed at the interest rate used to create the Option 1 rates, will be paid to the successor payee or to the last surviving payee's estate, if there is no successor payee.

**Option 2 – Life Income - Specified Guarantee Period Certain.** We will pay monthly payments for as long as the payee lives. We will require satisfactory proof of the payee's Age and gender. If the original payee (your Beneficiary) dies before all of the payments have been made for the specified guaranteed period certain the remaining payments will be treated as a death benefit and paid in accordance to federal tax law, and, if allowed:

a.) Payments will be continued during the remainder of the guaranteed period certain to the successor payee; or
b.) The present value of the remaining payments, computed at the interest rate used to create the Option 2 rates, will be paid to the successor payee or to the last surviving payee's estate, if there is no successor payee.

The specified guaranteed period certain choices are:

a.) 0 years (life income only);
b.) 10 years; or
c.) 20 years.



PLAINTIFF S EXHIBIT
Number 4 - pg 14

8900014505301 29695 CU042-3581-3 MC2671141 $35.27

**MEMBERS Life Insurance Company**

P.O. Box 61, 2000 Heritage Way Waverly, IA 50677-0061
1.888.787.8243 or visit www.trustage.com

TruStage™

**APPLICATION FOR**
Individual Whole Life Insurance

## APPLICANT COVERAGE

Name Timothy A Aguilar

Address 2807 RANDOLPH RD

City PASADENA State TX ZIP 77503

**Select the amount of Whole Life Coverage**

☒ $ 7,000

☐ Check here only if you do not want the automatic premium loan provision.* (see back)

Primary phone (832) 689-7311

Email address nonon@gmail.com

Social Security Number X X X - X X - 5 3 3 3

Date of birth 0 8 / 0 7 / 1 9 6 5 Gender ☒ Male ☐ Female

Height 5 feet 10 inches Weight 249 lbs

## EXISTING INSURANCE AND REPLACEMENT INFORMATION

Do you have any existing life insurance policies or annuity contracts with our company or any other company? ☒ YES ☐ NO

Will the coverage applied for replace, discontinue, or change any existing life coverage or annuities in this or any other company? ☐ YES ☒ NO

| Name of company | Amount | Type of coverage | Policy number |
|---|---|---|---|
| | | | |
| | | | |

## BENEFICIARY INFORMATION

| Beneficiary Name (s) | Relationship to You | Address |
|---|---|---|
| Kathy Aguilar- Primary | Spouse-100.0% | |
| | | |
| | | |
| | | |

## HEALTH INFORMATION

**Please answer these questions**

1) Have you used tobacco or nicotine products within the past 12 months? ☐ YES ☒ NO

2) Do you require assistance performing activities of daily living such as dressing, bathing, cooking, cleaning, or shopping due to a health condition or injury? ☐ YES ☒ NO

3) Are you currently hospitalized, under hospice care, or do you reside in an assisted living or nursing facility? ☐ YES ☒ NO

4) Other than routine care, in the past 3 months, have you been advised by a licensed medical professional to have surgery, any diagnostic test (other than for HIV) or any procedure which has not been completed or the results are unknown? ☐ YES ☒ NO

Approval is based upon your health and other factors affecting your insurability.

ISWLM20-B1 0122

ICC20-WLMLICAPP

**PLAINTIFF S EXHIBIT**

Number 4 - pg 15

5) Within the past 5 years, have you been treated or diagnosed by a medical professional for the following? (Check all that apply.) ☐ YES ☒ NO

☐ Cancer, except basal cell carcinoma (skin cancer)
☐ Diabetes
☐ Stroke
☐ Heart Disease or Condition (except high blood pressure)
☐ Chronic Kidney Disease
☐ Chronic Lung Disease
☐ Chronic Depression or Anxiety
☐ Bipolar Disorder or Schizophrenia
☐ Dementia or Alzheimer's Disease
☐ Head or Brain Injury or Disorder of the Brain or Spinal Nerves
☐ ALS (Lou Gehrig's Disease) or Muscular Dystrophy
☐ Alcohol or Drug Abuse
☐ Cirrhosis of the Liver
☐ HIV or AIDS

6) Do you require the use of oxygen? ☐ YES ☒ NO

7) Are you receiving dialysis? ☐ YES ☒ NO

## PAYMENT

Deduct
☒ Monthly
☐ Quarterly
☐ Semi-annually
☐ Annually

Option 1**Deduct from my
☒ Checking Account
☐ Savings Account

Routing # 031176110
Account # XXXXXXXXXXXXXX701
Financial institution name CAPITAL ONE N.A.

☐ Option 2** Deduct from my Credit/Debit Card (MC/VISA/Discover Only)

Account #________ Expiration date________
Name of card holder________
Special remarks________

Choose your automatic premium deduction date 15
Payments typically process in 1-3 business days (excluding weekends and holidays).

**I authorize by signing below, MEMBERS Life Insurance Company to deduct premiums from the account I've selected for the life coverage applied for on this application. This authorization will remain in effect until revoked by me in writing or by phone. If you leave this section blank, you will receive a bill.

☐ Option 3 Please send me a bill.

## AGREEMENT

I authorize by signing below, that I agree to all <u>four</u> of the following statements:

1. I authorize by signing below, that all my statements and answers are true to the best of my knowledge and belief. This application and any supplemental application(s) will be the basis of any insurance issued. I understand: (1) benefits may be denied during the first 2 years from the effective date if I fail to give true and complete answers in this application, as described in the incontestability provision of the policy; and (2) this insurance becomes effective only if: a.) my application is approved and a policy is issued; b.) my first full premium due is received while I am alive and within 21 days of my policy's effective date; and c.) answers to questions concerning my insurability are as stated in this application. Agents are not authorized to determine insurability, void, waive or change any terms of the application, or make a contract for the Company.

2. I authorize any health care providers, pharmacy benefit manager/ pharmaceutical firm, insurance companies, consumer reporting agency, the Department of Motor Vehicles, financial institution, or employer with information about my physical or mental health condition, substance or alcohol use, STDs, diagnosis or treatment of Human Immunodeficiency Virus (HIV), prescription drug records, financial status, employment status, or other relevant information about me, to give all information (except psychiatric treatment notes) to MEMBERS Life Insurance Company ("Company") or its reinsurers to determine eligibility for insurance or benefits. Such information will be released only to reinsurers, persons performing business duties as delegated or contracted for by the Company related to my application and insurance-related functions, as permitted or required by law, or as I further authorize. Health information shared for these purposes is not subject to federal health information privacy laws; however state privacy laws do apply.

3. I agree this authorization is valid for 24 months or such time limit as permitted in the state where the policy is delivered, a copy is as valid as the original, and I or my authorized representative can receive a copy upon request. For purposes of collecting information in connection with a claim for benefits, this Authorization is valid for the duration of the claim.

4. I understand that: (1) I can revoke this authorization at any time by written request to the Company; (2) revocation of this authorization will not affect any prior action taken by the Company in reliance upon this authorization, and (3) failure to sign, or revocation of this authorization may impair the Company's ability to evaluate claims or process applications and may be a basis for denying this application or a claim for benefits.

**Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.**

## SIGNATURE

Required Signature and Date Signed Authorizes Payment and Agreement

523944
TruStage
*Timothy A Aguilar*
X 01/15/2026 at 17:44:12 CST

Applicant's Signature Date Signed

***Automatic Premium Loan Provision:** Allows you to borrow against any accumulated cash value from your policy to pay a premium and help prevent policy cancellation. We suggest that you keep this feature.



PLAINTIFF'S EXHIBIT
Number 4 -- pg 16

W2

TruStage™

MEMBERS Life Insurance Company
P.O. Box 391 • 5910 Mineral Point Road • Madison, WI 53701
AP BU: LPR01

# Notice of Electronic Deposit

Questions regarding this payment, call 800/779-5433
EFT Reference Number: 8014571

000278 90083439000 5 01 01 1 0000 0 000
TIMOTHY A AGUILAR
2807 RANDOLPH RD
PASADENA, TX 77503

**NOT-NEGOTIABLE**
THIS IS NOT A BILL

**AMOUNT**
$35.27

**Account Ending in 6701**

| Invoice Number | Invoice Date | Transaction Number | Agreement Number | Claim Number | Paid Amount |
|---|---|---|---|---|---|
| LPR01SPACH_LPR_21 | 02/03/2026 | 0001734411 | 21MC2671141 | | $35.27 |

C21 FULL/PARTIAL SURRENDER

| | |
|---|---|
| Cash Value: | $0.00 |
| Dividends: | $0.00 |
| Cash Value of Paid-up Additional Insurance | $0.00 |
| Premium Refund: | $35.27 |
| Premium Deposit: | $0.00 |
| Unapplied Payments: | $0.00 |
| Outstanding Loan Balance: | $0.00 |
| Premium Payment: | $0.00 |
| Federal Withholding: | $0.00 |
| State Withholding: | $0.00 |
| Delivery Charge: | $0.00 |
| Amount of Distribution: | $35.27 |

The proceeds have been transmitted to your financial institution as requested. If you have given us permission, we have retained your account information.

Any taxable income reported follows below or on back:
This transaction did not have a taxable income to report to the Internal Revenue Service.

FOR QUESTIONS, PLEASE CONTACT OUR MEMBER SERVICES TEAM AT 1-800-779-5433.

| EFT Number | Deposit Date | Payee | Name | Total Amount |
|---|---|---|---|---|
| 8014571 | 02/05/2026 | MISCELLANE | TIMOTHY A AGUILAR | $35.27 |

PLAINTIFF S EXHIBIT
Number 5